## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| GEICO CORPORATION<br>GOVERNMENT EMPLOYEES INSURANCE COMPANY<br>GEICO GENERAL INSURANCE COMPANY<br>GEICO INDEMNITY COMPANY<br>GEICO CASUALTY COMPANY<br>GEICO ADVANTAGE INSURANCE COMPANY<br>GEICO CHOICE INSURANCE COMPANY<br>GEICO SECURE INSURANCE COMPANY<br>GEICO COUNTY MUTUAL INSURANCE COMPANY<br>　　　　*Plaintiffs*<br>V.<br><br>AISIN SEIKI CO., LTD.<br>AISIN AUTOMOTIVE CASTING, LLC<br>ASMO CO., LTD.<br>ASMO NORTH AMERICA, LLC<br>ASMO GREENVILLE OF NORTH CAROLINA, INC.<br>ASMO MANUFACTURING, INC.<br>DENSO CORPORATION<br>DENSO INTERNATIONAL AMERICA, INC.<br>DENSO INTERNATIONAL KOREA CORPORATION<br>DENSO KOREA AUTOMOTIVE CORPORATION<br>DENSO AUTOMOTIVE DEUTSCHLAND  GMBH<br>DTR INDUSTRIES, INC.<br>FURUKAWA ELECTRIC CO., LTD.<br>AMERICAN FURUKAWA, INC.<br>G.S. ELECTECH, INC.<br>G.S. WIRING SYSTEMS INC.<br>G.S.W. MANUFACTURING, INC.<br>LEONI WIRING SYSTEMS, INC.<br>LEONISCHE HOLDING INC. | Case No.<br><br><br>**COMPLAINT AND<br>DEMAND FOR JURY** |

MITSUBISHI ELECTRIC CORPORATION
MITSUBISHI ELECTRIC AUTOMOTIVE
AMERICA, INC.
MITSUBISHI ELECTRIC U.S. HOLDINGS, INC.
NSK AMERICAS, INC.
NSK LTD.
NSK STEERING SYSTEMS CO., LTD.
NSK STEERING SYSTEMS AMERICA, INC.
OMRON AUTOMOTIVE ELECTRONICS CO.,
LTD.
SCHAEFFLER AG
SCHAEFFLER GROUP USA INC.
SUMITOMO RIKO CO. LTD.
TOKAI RIKA CO., LTD.
TRAM INC. D/B/A TOKAI RIKA U.S.A. INC.
VALEO CLIMATE CONTROL CORP.
VALEO ELECTRICAL SYSTEMS, INC.
VALEO INC.
VALEO JAPAN CO., LTD.
　　　　　*Defendants.*

# COMPLAINT

Plaintiff GEICO Corporation and its affiliated entities, Government Employees Insurance Company, GEICO General Insurance Company, GEICO Indemnity Company, GEICO Casualty Company, GEICO Advantage Insurance Company, GEICO Choice Insurance Company, GEICO Secure Insurance Company and GEICO County Mutual Insurance Company, (collectively "GEICO") bring this action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection

and unjust enrichment laws. GEICO demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1. GEICO brings this lawsuit against Aisin Seiki Co., Ltd. and Aisin Automotive Casting, LLC ("Aisin"); DENSO Corporation, DENSO International America, Inc., DENSO International Korea Corporation, DENSO Korea Automotive Corporation, DENSO Automotive Deutschland GmbH, ASMO Co., Ltd., ASMO North America, LLC, ASMO Greenville Of North Carolina, Inc., and ASMO Manufacturing, Inc. ("DENSO"); Furukawa Electric Co., Ltd., American Furukawa, Inc. ("Furukawa"); G.S. Electech, Inc., G.S. Wiring Systems Inc., and G.S.W. Manufacturing, Inc. ("G.S. Electech"); Leoni Wiring Systems, Inc., and Leonische Holding Inc. ("Leoni"); Mitsubishi Electric Corporation, Mitsubishi Electric Automotive America, Inc., and Mitsubishi Electric U.S. Holdings, Inc. ("Mitsubishi"); NSK Americas, Inc., NSK Ltd., NSK Steering Systems Co., Ltd., and NSK Steering Systems America, Inc. ("NSK"); Omron Automotive Electronics Co., Ltd. ("Omron"); Schaeffler Group USA Inc. ("Schaeffler"); Sumitomo Riko Co. Ltd. and DTR Industries, Inc. ("Sumitomo Riko"); Tokai Rika Co., Ltd. and Tram Inc. D/B/A Tokai Rika U.S.A. Inc. ("Tokai Rika"); Valeo Climate Control Corp., Valeo Electrical Systems, Inc., Valeo Inc., and Valeo Japan Co., Ltd. ("Valeo") (collectively "Defendants"), and unnamed co-conspirators,

manufacturers and/or suppliers of Air Conditioning Systems, Air Flow Meters, Air Fuel Ratio Sensors, Alternators, Anti-Vibrational Rubber Parts, ATF Warmers, Automotive Hoses, Automotive Wire Harness Systems, Bearings, Ceramic Substrates, Electronic Powered Steering Assemblies, Fan Motors, Fuel Injection Systems, Fuel Senders, Heater Control Panels, High Intensity Discharge (HID) Ballasts, Ignition Coils, Instrument Panel Clusters, Inverters, Motor Generators, Power Window Motors, Power Window Switches, Radiators, Spark Plugs, Standard Oxygen Sensors, Starters, Valve Timing Control Devices, Windshield Washer Systems, and Windshield Wiper Systems (collectively "Auto Parts") for conspiring to unlawfully fix, raise, maintain and/or stabilize prices, rig bids and allocate markets and customers in the United States for Auto Parts.

2.     The Defendants manufacture, market and/or sell Auto Parts throughout and into the United States. The Defendants and their co-conspirators participated in conspiracies and agreed to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids, allocate sales of and fix, raise and maintain the prices of Auto Parts sold to vehicle manufacturers, repair professionals and others in the United States.

3.     The U.S. Department of Justice ("DOJ") Antitrust Division's expansive and ongoing criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry has become DOJ's largest simultaneous

criminal antitrust investigation in its history.  As part of the criminal probe, the Federal Bureau of Investigation ("FBI") has executed search warrants and raided the offices of a number of automotive parts makers, including Defendants' offices. The widespread and global investigation has led to criminal charges and fines against dozens of corporations and automotive parts executives.

4.     Defendants, co-conspirators of the Defendants in the *In re Automotive Parts Antitrust Litigation* case (MDL No. 2311) and unnamed co-conspirators have agreed to plead guilty to conspiracies to fix prices and rig bids for specific Auto Parts. Defendants and their co-conspirators have paid criminal fines, and their executives have been sentenced to prison time.

5.     To date, the ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.8 billion in criminal fines. New cases continue to arise "with regularity" and former Attorney General Eric Holder promised that DOJ "would check under every hood and kick every tire."

6.     Defendants' conspiracies and agreements to fix prices, rig bids and allocate markets unlawfully restrained interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and various state antitrust, unfair competition, consumer protection and unjust enrichment laws detailed below.

7.     According to former Attorney General Eric Holder, "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers, and more than 25 million cars purchased by American consumers" and "lasted for a decade or longer" in some instances.

8.     As a direct result of the anticompetitive and unlawful conduct alleged, GEICO paid and reimbursed its insureds and third-party claimants for artificially inflated prices for Auto Parts from as early as 1999 through today, as GEICO continues to suffer lasting price effects from Defendants' unlawful conspiracies. GEICO has thereby suffered antitrust injury to its business and property.

## JURISDICTION AND VENUE

9.     GEICO brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). GEICO also asserts claims under various state antitrust, unfair competition, consumer protection and unjust enrichment laws. GEICO seeks to obtain restitution, recover actual and exemplary damages and secure other relief against the Defendants for violations of those state laws. In addition, GEICO seeks attorneys' fees, costs and other expenses under federal and state law.

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the

Sherman Act (15 U.S.C. § 1) and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(a) and 1367 because: (i) the matter in controversy exceeds $75,000 and GEICO is a citizen of a different state than some Defendants and (ii) GEICO's state law claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) because one or more of the Defendants resides or transacts business in this District. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides, is licensed to do business in, is doing business in, has agents in, and/or is found or transacts business in this District.

12.     This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of its subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Auto Parts throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District;

and/or (d) was engaged in illegal price-fixing, bid rigging and market allocation conspiracies that were directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in or doing business throughout this District and the United States.  The Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

13.    The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

14.    The activities of the Defendants and their co-conspirators were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in interstate commerce.

15.    Auto Parts manufactured abroad by the Defendants and sold for use in vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Auto Parts are purchased in the United States, and such Auto Parts do not constitute import commerce, the Defendants' activities with respect thereto had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The

anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

16.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to GEICO. The Defendants, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain and/or stabilize prices, to rig bids and to allocate markets in the United States for Auto Parts, which unreasonably restrained trade.

## PARTIES

### Plaintiffs - GEICO

17.     Plaintiff GEICO Corporation is a Maryland corporation with its principal place of business in Chevy Chase, Maryland. GEICO Corporation purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods (defined below).

18.     Government Employees Insurance Company is a Maryland corporation with its principal place of business in Bethesda, Maryland. It is a wholly-owned subsidiary of GEICO Corporation. Government Employees Insurance Company purchased Auto Parts and reimbursed its insureds and third-

party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

19.   GEICO General Insurance Company is an Maryland corporation with its principal place of business is in Chevy Chase, Maryland. It is a wholly-owned subsidiary of GEICO Corporation. GEICO General Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

20.   GEICO Indemnity Company is a Maryland corporation with its principal place of business in Washington, DC.  GEICO Indemnity Company is a wholly-owned subsidiary of GEICO Corporation. GEICO Indemnity Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

21.   GEICO Casualty Company is a Maryland corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation. GEICO Casualty Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

22.   GEICO Advantage Insurance Company is a Nebraska Corporation with its principal place of business in Washington, DC. It is a wholly-owned

subsidiary of GEICO Corporation. GEICO Advantage Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

23.   GEICO Choice Insurance Company is a Nebraska corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation. GEICO Choice Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

24.   GEICO Secure Insurance Company is a Nebraska corporation with its principal place of business in Washington, DC. It is a wholly-owned subsidiary of GEICO Corporation. GEICO Secure Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

25.   GEICO County Mutual Insurance Company is a Texas corporation with its principal place of business in Dallas, Texas. It is a wholly-owned subsidiary of GEICO Corporation. GEICO County Mutual Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.

## Defendants

### *The Aisin Defendants*

26.     Aisin Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant Aisin Seiki Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Valve Timing Control Devices that were purchased throughout the United States, including in this district, during the Relevant Time Period.

27.     Aisin Automotive Casting, LLC is a Kentucky limited liability company with its principal place of business in London, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, Aisin Seiki Co., Ltd. Aisin Automotive Casting, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Valve Timing Control Devices that were purchased throughout the United States, including in this District, during the Relevant Time Period.

### *The DENSO Defendants*

28.     DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems, Air Fuel Ratio Sensors,

Alternators, ATF Warmers, Automotive Wire Harness Systems, Ceramic Substrates, Fan Motors, Fuel Injection Systems, Fuel Senders, Heater Control Panels, HID Ballasts, Ignition Coils, Instrument Panel Clusters, Inverters, Motor Generators, Power Window Motors, Radiators, Spark Plugs, Standard Oxygen Sensors, Starters, Valve Timing Control Devices, Windshield Washer Systems, and Windshield Wiper Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

29.     DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. DENSO International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Air Conditioning Systems, Air Flow Meters, Air Fuel Ratio Sensors, Alternators, ATF Warmers, Automotive Wire Harness Systems, Ceramic Substrates, Fan Motors, Fuel Injection Systems, Fuel Senders, Heater Control Panels, HID Ballasts, Ignition Coils, Instrument Panel Clusters, Inverters, Motor Generators, Power Window Motors, Radiators, Spark Plugs, Standard Oxygen Sensors, Starters, Valve Timing Control Devices, Windshield Washer Systems, and Windshield Wiper Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

30.     DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. Defendant DENSO International Korea Corporation manufactured, marketed and/or sold Fuel Injection Systems, Valve Timing Control Devices that were purchased throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Period, its activities in the United States were under the control and direction of its Japanese parent.

31.     DENSO Korea Automotive Corporation is a Korean corporation with its principal place in Changwon, South Korea. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. Denso Korea Automotive Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Windshield Wiper Systems that were purchased throughout the United States, including in this District, during the Relevant Time Period.

32.     DENSO Automotive Deutschland GmbH is a German company with its headquarters in Eching, Germany. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. DENSO Automotive Deutschland GmbH's President serves as one of DENSO Corporation's executive directors. DENSO Automotive Deutschland GmbH – directly and/or through its subsidiaries,

14

which it wholly owned and/or controlled – manufactured, marketed and/or sold Spark Plugs, Standard Oxygen Sensors, and Air Fuel Ratio Sensors that were purchased throughout the United States, including in this District, during the Relevant Time Period.

33.    ASMO Co., Ltd. is a Japanese corporation with its principal place of business in Shizuoka, Japan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. ASMO Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Windshield Washer Systems and Windshield Wiper Systems that were purchased throughout the United States, including in this District, during the Relevant Time Period.

34.    ASMO North America, LLC is a Delaware corporation with its principal place of business in Statesville, North Carolina. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. ASMO North America, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Windshield Washer Systems and Windshield Wiper Systems that were purchased throughout the United States, including in this District, during the Relevant Time Period. According to DENSO's website, ASMO North America, LLC is the "[r]egional

15

headquarters for ASMO affiliates in North America" and "coordinates the business activities of all affiliates in North America."

35.     ASMO Greenville of North Carolina, Inc. is a North Carolina company with its principal place of business in Greenville, North Carolina. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. ASMO Greenville of North Carolina, Inc. manufactured, marketed, and/or sold Windshield Wiper Systems that were purchased throughout the United States, including in this District, during the Relevant Time Period.

36.     ASMO Manufacturing, Inc. is a Michigan corporation with its principal place of business in Battle Creek, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. ASMO Manufacturing, Inc. manufactured, marketed, and/or sold Windshield Washer Systems that were purchased throughout the United States, including in this District, during the Relevant Time Period.

***The Furukawa Defendants***

37.     Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa Electric — directly and/or through its subsidiaries, which it wholly owned and/or controlled — manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period.

38.    American Furukawa, Inc. is a Delaware corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric. Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

**The G.S. Electech Defendants**

39.    G.S. Electech, Inc. is a Japanese corporation with its principal place of business in Toyota, Japan. Defendant GS Electech, Inc. — directly and/or through its subsidiaries, which it wholly owned and/or controlled — manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period.

40.    G.S. Wiring Systems Inc. is an Ohio corporation based in Findlay, Ohio. Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc. G.S. Wiring Systems Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period.

41.     G.S.W. Manufacturing, Inc. is an Ohio corporation based in Findlay, Ohio. Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc. G.S.W. Manufacturing Inc. represents itself as a Tier 1 and 2 supplier of Automotive Wire Harness Systems. G.S.W. Manufacturing Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period.

***The Leoni Defendants***

42.     Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leoni Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its German parent.

43.     Leonische Holding Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leonische Holding, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were

18

purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its German parent.

**The Mitsubishi Defendants**

44.    Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Electric Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators, Electronic Powered Steering Assemblies, Fuel Injection Systems, HID Ballasts, Ignition Coils, and Starters that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

45.    Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric US Holdings. Defendant Mitsubishi Electric Automotive America, Inc. manufactured, marketed and/or sold Alternators, Electronic Powered Steering Assemblies, Fuel Injection Systems, HID Ballasts, Ignition Coils, and Starters that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities

in the United States were under the control and direction of its United States or Japanese parents.

46.     Mitsubishi Electric U.S. Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation. Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators, Electronic Powered Steering Assemblies, Fuel Injection Systems, HID Ballasts, Ignition Coils, and Starters that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

***The NSK Defendants***

47.     NSK Ltd.("NSK") is a Japanese corporation with its principal place of business in Tokyo, Japan.  NSK— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings, Electronic Powered Steering Assemblies,  that were purchased throughout the United States, including in this district, during the Relevant Time Period.

48.    NSK Americas, Inc. is a Delaware corporation with its principal place of business in Ann Arbor, Michigan. It is a subsidiary of, and wholly owned or controlled by, its parent, NSK. Defendant NSK Americas sold Automotive Bearings, Electronic Powered Steering Assemblies,  that were purchased in the United States, including in this District, during the Relevant Time Period.  During the Relevant Time Period, its activities in the United States were under the control and direction of NSK.

49.    NSK Steering Systems Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. It is a subsidiary of, and wholly owned or controlled by, its parent, NSK Ltd. Defendant Steering Systems Co., Ltd. – directly and/or through its wholly owned and/or controlled subsidiaries – sold Electric Powered Steering Assemblies that were purchased in the United States, including in this District, during the Relevant Time Period. During the Relevant Time Period, its activities in the United States were under the control and direction of NSK Ltd.

50.    NSK Steering Systems America, Inc. is a Delaware corporation with its principal place of business in Bennington, Vermont. It is a subsidiary of, and wholly owned or controlled by, its parent, NSK Ltd. Defendant NSK Steering Systems America, Inc. sold Electric Powered Steering Assemblies that were purchased in the United States, including in this District, during the Relevant Time

Period. During the Relevant Time Period, its activities in the United States were under the control and direction of NSK Ltd.

***Omron***

51.     Omron Automotive Electronics Co., Ltd. is a Japanese corporation with its principal place of business in Komaki, Japan. Defendant Omron Automotive Electronics Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Power Window Switches that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

***The Schaeffler Defendants***

52.     Schaeffler AG ("Schaeffler") is a German corporation with its principal place of business in Herzogenaurach, Germany.  Schaeffler— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Relevant Time Period.

53.     Schaeffler Group USA Inc. is a Delaware corporation with its principal place of business in Fort Mill, South Carolina. It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler. Defendant Schaeffler USA sold Automotive Bearings that were purchased in the United States, including in

this District, during the Relevant Time Period. During the Relevant Time Period,

its activities in the United States were under the control and direction of Schaeffler.

### The Sumitomo Riko Defendants

54.    Sumitomo Riko Co. Ltd. is a Japanese corporation with its principal

place of business in Aichi, Japan. Sumitomo Riko Company – directly and/or

through its subsidiaries, which it wholly owned and/or controlled – manufactured,

marketed, and/or sold Automotive Hoses that were purchased throughout the

United States, including in this District, during the Relevant Time Period.

55.    DTR Industries, Inc. is an Ohio corporation with its principal place of

business in Bluffton, Ohio. It is a subsidiary of and wholly owned and/or

controlled by its parent, Sumitomo Riko. DTR manufactured, marketed, and/or

sold Automotive Hoses that were purchased throughout the United States,

including in this District, during the Relevant Time Period.

### The Tokai Rika Defendants

56.    Tokai Rika Co., Ltd. is a Japanese company with its principal place of

business in Toyota, Japan. Defendant Tokai Rika, Ltd. – directly and/or through its

subsidiaries, which it wholly owned and/or controlled – manufactured, marketed

and/or sold Automotive Wire Harness Systems and Heater Control Panels that

were purchased throughout the United States, including in this district, during the

Relevant Time Period.

57.     Tram Inc. D/B/A Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika, Co. Ltd. Executives who have worked at Tokai Rika Co. Ltd. have also worked at TRAM, Inc. For instance, Masayuki Morita, the President and Chief Operating Officer at TRAM, Inc. previously served as a Managing Director and Director at Tokai Rika Co., Ltd. During the Relevant Time Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed and/or sold Heater Control Panels that were purchased throughout the United States, including this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

**The Valeo Defendants**

58.     Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Electrical Systems, Inc. Valeo Climate Control Corp. manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

59.     Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly

24

owned and/or controlled by its parent, Valeo Inc. Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

60.   Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is an affiliate of and wholly controlled by Valeo Japan, Co., Ltd. Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period.

61.   Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan.  Valeo Japan Co., Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Relevant Time Period (defined below).

## AGENTS AND CO-CONSPIRATORS

62.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations and common course of conduct alleged.

63.     Others have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint—including non-settling and settling defendants from the *In re Automotive Parts Antitrust Litigation*, MDL No. 2311, various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and other individuals whose identities are presently unknown—and have performed acts and made statements in furtherance of the conspiracies.

64.     In this Complaint, when reference is made to any act, deed or transaction of any corporation, limited liability entity or other business structure, the allegation means that the corporation, limited liability entity or business engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the business or affairs of the corporation, limited liability entity or business.

## FACTUAL ALLEGATIONS

### I.    Defendants' Conspiracies Implicated Multiple Auto Parts

65.    Original equipment manufacturers ("OEMs") install Auto Parts in new cars as part of the automotive manufacturing process. OEMs purchase Auto Parts directly from Defendants for installation in new vehicles. When purchasing Auto Parts, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs. The OEMs will then select an automotive parts supplier and enter into contracts typically lasting for four to six years.

66.    Repair professionals also install Auto Parts in cars to replace worn out, defective or damaged parts.

67.    Defendants and their co-conspirators supplied Auto Parts to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators also supplied Auto Parts to automotive repair professionals located in the United States. Defendants and their co-conspirators manufactured Auto Parts (a) in the United States for installation in vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in vehicles manufactured, sold or repaired in the United States and (c) in Japan and elsewhere for installation in

vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

68.    GEICO purchased or reimbursed its insureds and third-party claimants for Auto Parts from Defendants. GEICO either (a) directly paid repair professionals for Auto Parts after the repair professional repaired its insureds or claimants' vehicles or (b) reimbursed its insureds or claimants for their purchase of Auto Parts from repair professionals. GEICO also reimbursed its insureds and claimants for the full value of the vehicle, including Auto Parts parts, when the vehicle was declared a total loss.

69.    Defendants and their co-conspirators agreed to fix prices, rig bids and allocate markets for the following Auto Parts:

### A.    *Air Conditioning Systems*

70.    "Air Conditioning Systems" are systems that cool the interior environment of a vehicle and are part of the thermal segment of the automotive market. Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: automotive compressors, condensers, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), control panels, sensors, and associated hoses and pipes.

### B.    Air Flow Meters

71.    "Air Flow Meters" measure the volume of air flowing into engines and are part of the engine management systems and automotive sensors segment of the automotive market.

### C.    Air Fuel Ratio Sensors

72.    "Air Fuel Ratio Sensors" are "wideband" oxygen sensors that enable more precise control of the air-to-fuel ratio injected into the engine. Air Fuel Ratio Sensors are therefore a type of Oxygen Sensors.

### D.    Alternators

73.    "Alternators" are devices that charge a vehicle's battery and power the electrical system of a vehicle when its engine is running.

### E.    Anti-Vibrational Rubber Parts

74.    "Anti-Vibrational Rubber Parts" are comprised primarily of rubber and metal, and are installed in suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

### F.    ATF Warmers

75.    "ATF Warmers" are devices that charge a vehicle's battery and power the electrical system of a vehicle when its engine is running.

### G.   *Automotive Hoses*

76.   "Automotive Hoses" are flexible tubes used to convey liquid and air in automotive vehicles. "Automotive Hoses" include low-pressure rubber hoses used in automobile engine compartments and plastic and resin tubes used in automobile engine compartments and fuel tank modules.

### H.   *Automotive Wire Harness Systems*

77.   "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring and circuit boards in a vehicle. Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle and include the following: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors and speed sensor wire assemblies.

### I.   *Bearings*

78.   "Automotive Bearings" are devices in an automotive vehicle used to position, hold and guide moving parts, as well as to reduce friction between moving and fixed parts. Automotive Bearings are located throughout an automotive vehicle. "Automotive Bearings" include the following devices used in automotive vehicles: ball bearings, tapered roller bearings, roller bearings, mounted bearings, and parts and components for ball and roller bearings.

### *J.     Ceramic Substrates*

79.     A "Ceramic Substrate" is an uncoated ceramic monolith with a fine honeycomb structure that, after coating by third parties with a mix of metal and other chemicals, is incorporated into an automotive catalytic converter.

### *K.     Electronic Powered Steering Assemblies*

80.     "Electric Powered Steering Assemblies," which are defined to include electric power steering motors, provide electronic power to assist the driver to more easily steer the automobile. Electric Powered Steering Assemblies link the steering wheel to the tires, and include the column, intermediate shaft, electronic control unit, but do not include the steering wheel or tires. "Pinion-Assist Type Electric Powered Steering Assemblies" provide power to the steering gear pinion shaft from electric motors to assist the driver to more easily steer the automobile. Pinion-Assist Type Electric Powered Steering Assemblies include an electronic control unit and link the steering wheel to the tires, but do not include the column, intermediate shaft, steering wheel or tires. Pinion-Assist Type Electric Powered Steering Assemblies are a subset of Electric Powered Steering Assemblies. The term Electric Powered Steering Assemblies, as used in this Complaint, includes Pinion-Assist Type Electric Powered Steering Assemblies as well as all component parts of the assemblies, including the steering column, intermediate shaft,

electronic control unit, and electric power steering motors (but not the steering wheel or tires).

### L.    Fan Motors

81.    "Fan Motors" are small electric motors used to turn radiator cooling fans.

### M.    Fuel Injection Systems

82.    "Fuel Injection Systems" admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, airflow meters, engine electronic control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors, pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system. In some instances, the component parts of a Fuel Injection System are sourced separately while in other instances they are sourced together. Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system.

### N.    Fuel Senders

83.    "Fuel Senders" measure the amount of fuel in a vehicle's fuel tank.

### O.   Heater Control Panels

84.   "Heater Control Panels" are located in the center console, back seat or rear cabin of an automobile and control the temperature of the interior environment of a vehicle. Heater Control Panels are either mechanical or electrical.

### P.   High Intensity Discharge Ballasts

85.   "High Intensity  Discharge Ballasts" or "HID Ballasts" is an electrical device that limits the amount of electrical current flowing to an HID headlamp, which would otherwise rise to destructive levels due to the HID headlamp's negative resistance.

### Q.   Ignition Coils

86.   "Ignition Coils" are part of the fuel ignition system of an automobile and release electric energy suddenly to ignite a fuel mixture.

### R.   Instrument Panel Clusters

87.   "Instrument Panel Clusters" also known as meters, are the mounted array of instruments and gauges housed in front of the driver of an automobile.

### S.   Inverters

88.   "Inverters" provide power to motors by converting direct current electricity from a vehicle's battery to alternating current electricity.

### *T. Motor Generators*

89.  "Motor Generators" are electric motors used to power electric drive systems that can also capture energy from the process of stopping a vehicle to generate electricity through regenerative braking.

### *U. Power Window Motors*

90.  "Power Window Motors" are small electric motors used to raise and lower vehicle windows.

### *V. Power Window Switches*

91.  "Power Window Switches" are automobile switches that raise or lower an automobile's electric windows.

### *W. Radiators*

92.  "Radiators" are devices located in the engine compartment of a vehicle that cool the engine and include radiator fans. Radiators are replaced when a vehicle consistently overheats.

### *X. Spark Plugs*

93.  "Spark Plugs" are located in the engine and deliver high electric voltage from the ignition system to the combustion chamber of an internal combustion engine.

### Y.     Standard Oxygen Sensors

94.     "Standard Oxygen Sensors" are located in the exhaust system and measure the amount of oxygen in the exhaust.

### Z.     Starters

95.     "Starters" or "Starter Motors" are devices that power a vehicle's battery to "turn over" and start when the driver turns the ignition switch. When a Starter is damaged, a vehicle will not turn on.

### AA.    Valve Timing Control Devices

96.     "Valve Timing Control Devices" or "Variable Valve Timing Systems" control the opening/closing timing of the intake valve and exhaustive valve according to driving conditions and are part of the engine management system of the automotive market. Each Valve Timing Control Device includes the variable cam timing ("VCT"), actuator and/or solenoid valve. In addition, some Valve Timing Control Devices contain an oil flow control valve ("OCV"). Valve Timing Control Manufacturers sell VCTs and OCVs together and separately.

### BB.    Windshield Washer Systems

97.     "Windshield Washer Systems," whether sold together or separately, are defined to include one or more of the following: the pump, hoses, nozzle and tank necessary to deliver washer fluid to vehicle windows.

### CC.   Windshield Wiper Systems

98.   "Windshield Wiper Systems", whether sold together or separately, are defined to include one or more of the following: the motor, linkage, arm and blade necessary to clear water or snow from vehicle windows.

## II.   Defendants and Their Co-Conspirators Entered into Multiple Auto Part Conspiracies

99.   Defendants and their co-conspirators entered into numerous Auto Parts conspiracies to fix prices, rig bids and allocate markets. According to Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, in September 2013, there were more than a dozen separate conspiracies each operating independently but all targeting the U.S. automotive industry. The Auto Parts conspiracies challenged in this Complaint include:

(a)   *Air Conditioning Systems Conspiracy:* DENSO and Valeo conspired with other manufacturers of Air Conditioning Systems to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Air Conditioning Systems from May 1999 to at least February 2010 ("Air Conditioning Systems Relevant Time Period"). The Air Conditioning Systems Conspiracy caused GEICO to pay supra-competitive prices for Air Conditioning Systems and thus injured GEICO in its business. The anticompetitive effects

36

of DENSO and Valeo and their co-conspirators' unlawful conduct continue to be felt.

(b)  ***Air Flow Meters Conspiracy***: DENSO conspired with other manufacturers of Air Flow Meters to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Air Flow Meters from January 2000 to at least February 2010 ("Air Flow Meters Relevant Time Period"). The Air Flow Meters Conspiracy caused GEICO to pay supra-competitive prices for Air Flow Meters and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(c)  ***Air Fuel Ratio Sensors Conspiracy:*** DENSO conspired with other manufacturers of Air Fuel Ratio Sensors to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Air Fuel Ratio Sensors from January 2000 to at least February 2010 ("Air Fuel Ratio Sensors Relevant Time Period"). The Air Fuel Ratio Sensors Conspiracy caused GEICO to pay supra-competitive prices for Air Fuel Ratio Sensors and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(d)  ***Alternators Conspiracy***: DENSO and Mitsubishi conspired with other manufacturers of Alternators to fix, raise, stabilize and control prices of, rig

bids and/or allocate markets for Alternators from January 2000 to at least February 2010 ("Alternators Relevant Time Period"). The Alternators Conspiracy caused GEICO to pay supra-competitive prices for Alternators and thus injured GEICO in its business. The anticompetitive effects of DENSO and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(e)   ***Anti-Vibrational Rubber Parts Conspiracy:*** Sumitomo Riko conspired with other manufacturers of Anti-Vibrational Rubber Parts to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Alternators from March 1996 to at least February 2010 ("Anti-Vibrational Rubber Parts Relevant Time Period"). The Anti-Vibrational Rubber Parts Conspiracy caused GEICO to pay supra-competitive prices for Anti-Vibrational Rubber Parts and thus injured GEICO in its business. The anticompetitive effects of Sumitomo Riko and its co-conspirators' unlawful conduct continue to be felt.

(f)   ***ATF Warmers Conspiracy***: DENSO conspired with other manufacturers of ATF Warmers to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for ATF Warmers from November 2002 to at least February 2010 ("ATF Warmers Relevant Time Period"). The ATF Warmers Conspiracy caused GEICO to pay supra-competitive prices for

ATF Warmers and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(g)     *Automotive Hoses Conspiracy:* Sumitomo Riko conspired with other manufacturers of Automotive Hoses to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Automotive Hoses from May 2003 to at least February 2010 ("Automotive Hoses Relevant Time Period"). The Automotive Hoses Conspiracy caused GEICO to pay supra-competitive prices for Automotive Hoses and thus injured GEICO in its business. The anticompetitive effects of Sumitomo Riko and its co-conspirators' unlawful conduct continue to be felt.

(h)     *Automotive Wire Harness Systems Conspiracy*: DENSO, Furukawa, GS Electech, Leoni, Mitsubishi, and Tokai Rika conspired with other manufacturers of Automotive Wire Harness Systems to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Automotive Wire Harness Systems from as early as 1999 to at least 2010 ("Automotive Wire Harness Systems Relevant Time Period"). The Automotive Wire Harness Systems Conspiracy caused GEICO to pay supra-competitive prices for Automotive Wire Harness Systems and thus injured GEICO in its business. The anticompetitive effects of DENSO, Furukawa, GS Electech, Leoni,

Mitsubishi, and Tokai Rika and their co-conspirators' unlawful conduct continue to be felt.

(i)      ***Bearings Conspiracy:*** NSK and Schaeffler conspired with other manufacturers of Bearings to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Bearings from January 2000 to at least February 2010 ("Bearings Relevant Time Period"). The Bearings Conspiracy caused GEICO to pay supra-competitive prices for Bearings and thus injured GEICO in its business. The anticompetitive effects of NSK and Schaeffler and their co-conspirators' unlawful conduct continue to be felt.

(j)      ***Ceramic Substrates Conspiracy:*** DENSO conspired with other manufacturers of Ceramic Substrates to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Ceramic Substrates from July 1999 to at least February 2010 ("Bearings Relevant Time Period"). The Ceramic Substrates Conspiracy caused GEICO to pay supra-competitive prices for Ceramic Substrates and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(k)      ***Electronic Powered Steering Assemblies Conspiracy***: Mitsubishi and NSK conspired with other manufacturers of Electronic Powered Steering Assemblies to fix, raise, stabilize and control prices of, rig bids and/or

allocate markets for Electronic Powered Steering Assemblies from January 2005 to at least February 2010 ("Bearings Relevant Time Period"). The Electronic Powered Steering Assemblies Conspiracy caused GEICO to pay supra-competitive prices for Electronic Powered Steering Assemblies and thus injured GEICO in its business. The anticompetitive effects of Mitsubishi and NSK and their co-conspirators' unlawful conduct continue to be felt.

(l)     **Fan Motors Conspiracy:** DENSO conspired with other manufacturers of Fan Motors to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Fan Motors from January 2000 to at least February 2010 ("Fan Motors Relevant Time Period"). The Fan Motors Conspiracy caused GEICO to pay supra-competitive prices for Fan Motors and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(m)     **Fuel Injection Systems Conspiracy:** DENSO and Mitsubishi conspired with other manufacturers of Fuel Injection Systems to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Fuel Injection Systems from January 2000 to at least February 2010 ("Fuel Injection Systems Relevant Time Period"). The Fuel Injection Systems Conspiracy caused GEICO to pay supra-competitive prices for Fuel

41

Injection Systems and thus injured GEICO in its business. The anticompetitive effects of DENSO and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(n)     *Fuel Senders Conspiracy:* DENSO conspired with other manufacturers of Fuel Senders to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Fuel Senders from January 2001 to at least February 2010 ("Fuel Senders Relevant Time Period"). The Fuel Senders Conspiracy caused GEICO to pay supra-competitive prices for Fuel Senders and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(o)     *Heater Control Panels Conspiracy:* DENSO conspired with other manufacturers of Heater Control Panels to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Heater Control Panels from January 1999 to at least February 2010 ("Heater Control Panels Relevant Time Period"). The Heater Control Panels Conspiracy caused GEICO to pay supra-competitive prices for Heater Control Panels and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(p)     *High Intensity Discharge Ballasts Conspiracy***:** DENSO and Mitsubishi conspired with other manufacturers of HID Ballasts to fix, raise,

stabilize and control prices of, rig bids and/or allocate markets for HID Ballasts from July 1998 to at least February 2010 ("HID Ballasts Relevant Time Period"). The High Intensity Discharge Ballasts Conspiracy caused GEICO to pay supra-competitive prices for High Intensity Discharge Ballasts and thus injured GEICO in its business. The anticompetitive effects of DENSO and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(q)     *Ignition Coils Conspiracy*: DENSO and Mitsubishi conspired with other manufacturers of Ignition Coils to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Ignition Coils from January 2000 to at least February 2010 ("Ignition Coils Relevant Time Period"). The Ignition Coils Conspiracy caused GEICO to pay supra-competitive prices for Ignition Coils and thus injured GEICO in its business. The anticompetitive effects of DENSO and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(r)     *Instrument Panel Clusters Conspiracy:*     DENSO conspired with other manufacturers of Instrument Panel Clusters to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Instrument Panel Clusters from January 1999 to at least February 2010 ("I Instrument Panel Clusters Relevant Time Period"). The Instrument Panel Clusters Conspiracy

caused GEICO to pay supra-competitive prices for Instrument Panel Clusters and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(s)     ***Inverters Conspiracy***: DENSO conspired with other manufacturers of Inverters to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Inverters from January 2000 to at least February 2010 ("Inverters Relevant Time Period"). The Inverters conspiracy caused GEICO to pay supra-competitive prices for Inverters and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(t)     ***Motor Generators Conspiracy***: DENSO conspired with other manufacturers of Motor Generators to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Motor Generators from January 2000 to at least February 2010 ("Motor Generators Relevant Time Period"). The Motor Generators Conspiracy caused GEICO to pay supra-competitive prices for Motor Generators and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(u)     ***Power Window Motors Conspiracy***: DENSO conspired with other manufacturers of Power Window Motors to fix, raise, stabilize and control

44

prices of, rig bids and/or allocate markets for Power Window Motors from January 2000 to at least February 2010 ("Power Window Motors Relevant Time Period"). The Power Window Motors Conspiracy caused GEICO to pay supra-competitive prices for Power Window Motors and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(v)     *Power Window Switches Conspiracy:* Omron conspired with other manufacturers of Power Window Switches to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Power Window Switches from January 2000 to at least February 2010 ("Power Window Switches Relevant Time Period"). The Power Window Switches Conspiracy caused GEICO to pay supra-competitive prices for Power Window Switches and thus injured GEICO in its business. The anticompetitive effects of Omron and its co-conspirators' unlawful conduct continue to be felt.

(w)     *Radiators Conspiracy*: DENSO conspired with other manufacturers of Radiators to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Radiators from February 2001 to at least February 2010 ("Radiators Relevant Time Period"). The Radiators Conspiracy caused GEICO to pay supra-competitive prices for Radiators and thus injured

45

GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(x)     ***Spark Plugs Conspiracy:*** DENSO conspired with other manufacturers of Spark Plugs to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Spark Plugs from January 2000 to at least February 2010 ("Spark Plugs Relevant Time Period"). The Spark Plugs Conspiracy caused GEICO to pay supra-competitive prices for Spark Plugs and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(y)     ***Standard Oxygen Sensors Conspiracy:*** DENSO conspired with other manufacturers of Standard Oxygen Sensors to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Standard Oxygen Sensors from February 2001 to at least February 2010 ("Standard Oxygen Sensors Relevant Time Period"). The Standard Oxygen Sensors Conspiracy caused GEICO to pay supra-competitive prices for Standard Oxygen Sensors and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(z)     ***Starters Conspiracy***: DENSO and Mitsubishi conspired with other manufacturers of Starters to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Starters from January 2000 to at least February

2010 ("Starters Relevant Time Period"). The Starters Conspiracy caused GEICO to pay supra-competitive prices for Starters and thus injured GEICO in its business. The anticompetitive effects of DENSO and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(aa)   *Valve Timing Control Devices Conspiracy*: Aisin Seiki, DENSO, and Mitsubishi conspired with other manufacturers of Valve Timing Control Devices to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Valve Timing Control Devices from January 2000 to at least February 2010 ("Valve Timing Control Devices Relevant Time Period"). The Valve Timing Control Devices Conspiracy caused GEICO to pay supra-competitive prices for Valve Timing Control Devices and thus injured GEICO in its business. The anticompetitive effects of Aisin Seiki, DENSO, and Mitsubishi and their co-conspirators' unlawful conduct continue to be felt.

(bb)   *Windshield Washer Systems Conspiracy:* DENSO conspired with other manufacturers of Windshield Washer Systems to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Windshield Washer Systems from January 2000 to at least February 2010 ("Windshield Washer Systems Relevant Time Period"). The Windshield Washer Systems Conspiracy caused GEICO to pay supra-competitive prices for Windshield

Washer Systems and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

(cc)   *Windshield Wiper systems Conspiracy:* DENSO conspired with other manufacturers of Windshield Wiper Systems to fix, raise, stabilize and control prices of, rig bids and/or allocate markets for Windshield Wiper Systems from January 2000 to at least February 2010 ("Windshield Wiper Systems Relevant Time Period"). The Windshield Wiper Systems Conspiracy caused GEICO to pay supra-competitive prices for Windshield Wiper Systems and thus injured GEICO in its business. The anticompetitive effects of DENSO and its co-conspirators' unlawful conduct continue to be felt.

100.   The DOJ, in its public announcements, described how the Defendants and their co-conspirators carried out these multiple conspiracies. Defendants and their co-conspirators agreed, during meetings and conversations, to allocate the supply of named Auto Parts products on a model-by-model basis and to coordinate price adjustments. To maintain the secrecy of the conspiracies, Defendants and their co-conspirators used code names, met in remote or private locations and employed other measures. They also ensured that their co-conspirators adhered to the agreements through an informal monitoring system.

101. The Air Conditioning Systems Relevant Time Period, Air Flow Meters Relevant Time Period, Air Fuel Ratio Sensors Relevant Time Period, Alternators Relevant Time Period, Anti-Vibrational Rubber Parts Relevant Time Period, ATF Warmers Relevant Time Period, Automotive Hoses Relevant Time Period, Automotive Wire Harness Systems Relevant Time Period, Bearings Relevant Time Period, Ceramic Substrates Relevant Time Period, Electronic Powered Steering Assemblies Relevant Time Period, Fan Motors Relevant Time Period, Fuel Injection Systems Relevant Time Period, Fuel Senders Relevant Time Period, Heater Control Panels Relevant Time Period, HID Ballasts Relevant Time Period, Ignition Coils Relevant Time Period, Instrument Panel Clusters Relevant Time Period, Inverters Relevant Time Period, Motor Generators Relevant Time Period, Power Window Motors Relevant Time Period, Power Window Switches Relevant Time Period, Radiators Relevant Time Period, Spark Plugs Relevant Time Period, Standard Oxygen Sensors Relevant Time Period, Starters Relevant Time Period, Valve Timing Control Devices Relevant Time Period, Windshield Washer Systems Relevant Time Period, and Windshield Wiper Systems Relevant Time Period are collectively referred to as the "Relevant Time Periods."

III.   **Governments Around the World Have Initiated Investigations into the Auto Parts Conspiracies**

      *A.*   ***Global Government Investigations into Price-Fixing in the Automotive Parts Industry***

102.   The United States, Europe, Canada and Japan have coordinated their antitrust investigations of suppliers of Auto Parts.

103.   On February 24, 2010, the European Commission executed surprise raids at the European offices of certain Automotive Wire Harness manufacturers. The EC also confirmed that it had initiated investigations into other electronic and electrical distribution systems.

104.   Parallel raids were conducted simultaneously with the EC raids in the United States and Japan as part of a coordinated international operation. On February 23, 2010, the FBI executed search warrants and raided the offices of Yazaki North America, DENSO and Tokai Rika in the Detroit area. Lear also confirmed that it was a target of the EC investigation. At this time, the FBI did not disclose the "substance or reason behind the warrants." The DOJ, however, issued a general statement that it was "investigating the possibility of anticompetitive cartel conduct of automotive electronic components suppliers" but provided no further detail. The Japan Fair Trade Commission similarly searched the offices of several Auto Parts manufacturers.

105.   The scope and magnitude of the Auto Parts investigations slowly have expanded and became public, as DOJ continues to announce the automotive manufacturer firms and executives who have plead guilty to conspiracies to fix the prices and/or rig bids of specific Auto Parts. As Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, explained in September 2013, the DOJ "ha[s] seen a pattern during the course of this investigation. The detection of one auto part conspiracy has led to the discovery of other conspiracies involving a new set of products, a new group of conspirators and a new list of victims."

### B.    Criminal Pleadings in the Automotive Parts Industry

106.   The DOJ announced its first criminal charges against Furukawa Electric Co. Ltd. arising from its federal antitrust investigation into bid rigging, price fixing and other anticompetitive conduct in the automotive parts industry on September 29, 2011.  Furukawa Electric Co. Ltd. agreed to plead guilty and pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving Automotive Wire Harnesses and related products.

107.   On January 30, 2012, the DOJ announced DENSO Corporation, Yazaki Corporation and four executives had agreed to plead guilty and pay fines for its involvement in multiple price-fixing and bid-rigging conspiracies in the sale of Auto Parts in the United States. Yazaki agreed to pay a $470 million criminal

fine—the second largest criminal fine for a Sherman Act violation—for its conspiracies to rig bids for and fix, stabilize and maintain the prices of Automotive Wire Harnesses, Instrument Panel Clusters and Fuel Senders.  In addition, four executives agreed to plead guilty for their participation in the conspiracies and to serve prison time ranging from 15 months to two years. According to the DOJ, the two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation. Four months later, on April 23, 2012, the DOJ announced that another manufacturer, Fujikura Ltd., agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to fix prices wire harnesses and related products.

108.  On June 6, 2012, the DOJ announced that Autoliv, Inc. agreed to plead guilty and pay a $14.5 million criminal final for its role in a conspiracy to fix the prices of Occupant Safety Systems.

109.  On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH agreed to plead guilty and to pay $5.1 million criminal fine for its involvement in a conspiracy to fix prices of Occupant Safety Restraint Systems.

110.  On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of HID Ballasts, Switches and Steering Angle Sensors installed in automobiles sold in the

United States and elsewhere.   Then, on September 24, 2013, a federal grand jury returned an indictment against a Panasonic Automotive Systems Corporation executive for his role in the conspiracy to fix prices of Switches and Steering Angle Sensors sold to Toyota.

111. On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in fixing the prices and/or rigging bids of more than 30 different Auto Part products, including three of the named Defendants in this Complaint:

(a)     Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to fix prices and rig bids for Alternators, Electronic Powered Steering Assemblies, Fuel Injection Systems, HID Ballasts, Ignition Coils, and Starters sold to automobile manufacturers in the United States and elsewhere;

(b)     NSK, Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to fix prices and rig bids for Automotive Bearings and Electronic Powered Steering Assemblies sold to automobile manufacturers in the United States and elsewhere.

(c)     Valeo Japan Co., Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to fix prices and rig

bids for Air Conditioning Systems sold to automobile manufacturers in the United States and elsewhere.

112. To date, at least forty-six companies and sixty-four individuals have been charged in the DOJ's Antitrust Division's ongoing investigation into price-fixing and bid rigging in the automotive parts industry. Together, these companies and executives have agreed to pay more than $2.8 billion in criminal fines. The Antitrust Division continues to regularly announce new indictments and guilty pleas in the automotive industry as part of its ongoing criminal investigation.

113. Former United States Attorney General Eric Holder estimated in September 2013 that "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, stated that "[s]ome of these price-fixing conspiracies lasted for a decade or longer."

## IV. The Unique Structure and Characteristics of the Auto Parts Industry Facilitated the Unlawful Conspiracies

114. Collusion is more likely to occur in some industries than others. Conditions of the Auto Parts industry are particularly favorable to collusion and consequently have fostered price-fixing, bid rigging and market allocation practices. Specifically, the unique characteristics of the Auto Parts industry include

(1) high barriers to entry; (2) inelasticity of demand and standardization of Auto Parts; (3) a unique culture of cooperation and (4) high market concentration for particular Auto Parts.

### A.    The Auto Parts Industry Has High Barriers to Entry

115.   The ease with which new firms may enter a market impacts whether a particular industry may be susceptible to collusion and cartel behavior. Generally, if competitors collude and agree to raise prices, the collusive behavior attracts new entrants seeking to undercut the supra-competitive prices. If a particular industry has high barriers to entry, however, new entrants are less likely to enter a market in response to an increase or stabilization of prices.  High entry barriers thus facilitate the formation and maintenance of a cartel.

116.   As described above, numerous Auto Parts submarkets exist, including the Air Conditioning Systems Market, Air Flow Meters Market, Air Fuel Ratio Sensors Market, Alternators Market, Anti-Vibrational Rubber Parts Market, ATF Warmers Market, Automotive Hoses Market, Automotive Wire Harness Systems Market, Bearings Market, Ceramic Substrates Market, Electronic Powered Steering Assemblies Market, Fan Motors Market, Fuel Injection Systems Market, Fuel Senders Market, Heater Control Panels Market, High Intensity Discharge Ballasts Market, Ignition Coils Market, Instrument Panel Clusters Market, Inverters Market, Motor Generators Market, Power Window Motors Market, Power

Window Switches Market, Radiators Market, Spark Plugs Market, Standard Oxygen Sensors Market, Starters Market, Valve Timing Control Devices Market, Windshield Washer Systems Market, and Windshield Wiper Systems Market (collectively the "Auto Parts Submarkets"). There are substantial barriers that preclude, reduce or make entry into the Auto Parts Submarkets more difficult. A new entrant in the Auto Parts Submarkets would face costly and lengthy start-up costs, including multimillion dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, securing skilled labor and establishing customer relationships.

117.   The high research and development costs associated with the Auto Parts industry also deter potential entrants. Auto Parts manufacturers are constantly researching the functionality and safety of their parts. To compete, an entrant must be committed to spending a significant amount of resources on research and development.

118.   Defendants also own patents on various Auto Parts. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product by either seeking a license or designing around the applicable patent.

119.   In addition, repair professionals have little choice in selecting the Auto Parts manufacturer from which they will purchase parts. OEMs design the

features of their vehicles so that specific Auto Parts are integrated with other Auto Parts, electronics and mechanics of the particular vehicle model. Thus, when repair professionals need to replace an Auto Part, they are limited to those manufacturers who sell the part that fits a particular vehicle model. For a new entrant, it would be difficult—if not impossible—to offer Auto Parts for sale, particularly when patents are at issue.

### B.   There is Inelasticity of Demand for Auto Parts

120.   Cross-elasticity of demand measures the extent to which the quantity demanded of one product or service will change in response to a change in the price of a second product or service. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.

121.   The lack of available substitute products or services contributes to the cross-elasticity of demand. High cross-elasticity of demand between two products indicates that the products are good substitutes for one another. If products cannot be easily substituted for the product at issue, or if there are other restrictive specifications of the products, the probability of collusion increases.

122.   Fewer substitutes, and thus inelastic demand, facilitate collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

123.   Demand for Auto Parts is highly inelastic because there are no close substitutes for these products. As discussed, OEMs design the features of their vehicles so that the Auto Parts they purchase for a vehicle are then integrated with the other parts, electronics and mechanics of a particular vehicle model. Thus, available and feasible substitutes are inherently limited because repair professionals must use a specific Auto Part. Consequently, when insureds or claimants need to replace a defective or damaged part in their vehicles, they have little choice in Auto Parts, even if the prices are maintained at a supra-competitive level.

### C. Certain Auto Parts Submarkets Are Highly Concentrated

124.   Collusion is more likely if there are fewer sellers. With fewer sellers in a given market, the competing sellers may more easily coordinate their actions and collude. Not only does a concentrated market facilitate actual collusion, but concentrated markets may also assist conspirators in policing the cartel. With fewer competitors, cartel members may more easily detect and punish firms that deviate from the collusive behavior.

125.   There is a high level of concentration among firms in several of the Auto Parts submarkets. Further, Defendants dominate many of the Auto Parts submarkets and exercise control over prices and the conspiracies challenged here.

### D.     The Culture of the Auto Parts Industry Is Conducive to Collusion

126.   Collusion is more likely to occur if the competitors know each other through trade associations, conferences, social connections, business contacts or shifting employment. The close-knit culture of the Auto Parts industry fostered and presented opportunities for Defendants and their co-conspirators to conspire.

127.   Defendants attended and continue to attend industry events and conferences where they have the opportunity to meet, agree on prices and other anticompetitive practices and coordinate carrying out the acts necessary for the operation and furtherance of the alleged conspiracies. For example, the Original Equipment Suppliers Association ("OESA") hosts an annual conference in Detroit, Michigan, which provides numerous opportunities for Auto Parts manufacturers to meet and conspire. In addition, OESA is comprised of numerous councils and committees, further providing Auto Parts members opportunities to coordinate and further their conspiracies.  OESA is just one example of an industry organization that may have served as a conduit for conspiratorial conduct.

128.   Auto Dealers and other industry participants (possibly unknowingly) also facilitated Auto Parts conspiratorial conduct. Toyota has a supplier group called Kyohokai, which hosts golf and other social outings for executives of more than 200 companies to get to know each other and share information. Established in 1943, Kyohokai also holds executive roundtables and makes proposals to

Toyota on particular issues. Kyohokai offered one platform in which the Defendants could organize and further their conspiracies.

129.    Finally, the culture of the companies themselves plays a significant role. Much of the focus of the global government investigations has been on Japanese suppliers. Business traditions and the unique culture in Japan may have contributed to this collusion, as industrial groups tend to favor cooperation over competition.

## V.    Price Fixing, Bid Rigging and Market Allocation Are *Per Se* Unlawful

130.    Price fixing occurs when two or more competitors agree to actions that have the effect of raising, fixing or stabilizing prices of a product or service. Price fixing is a *per se* violation of the Sherman Act and may be proven by direct or circumstantial evidence.

131.    With bid rigging, competitors will agree in advance who will submit the winning bid on a contract subject to the competitive bid rigging process. Bid rigging may take many forms and serves as a means of conspiring competitors to raise prices when purchasers solicit competing bids. Bid rigging is a *per se* violation of the antitrust laws.

132.    Market allocation occurs when two or more competitors agree to divide sales territories, assign customers or allocate a specific percentage of

available business to each producer. Market allocation is also a *per se* violation of the antitrust laws.

133.   Courts have determined that *per se* practices have no legitimate justification and lack any redeeming competitive purpose so should be considered unlawful without any further analysis of their effects, reasonableness or economic justifications.

134.   Defendants and their co-conspirators agreed to actions that had the effect of fixing the prices of and rigging bids and allocating markets for Auto Parts. The collusive schemes inflated the prices of Auto Parts, and GEICO and its insureds and claimants paid more for these parts than they would have otherwise in the absence of the conspiracies. On May 25, 2014, news sources reported that Brent Snyder, a Deputy Assistant Attorney General in DOJ's Antitrust Division, stated that "[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of [these] conspiracy[ies]."

135.   Because price fixing, bid rigging and market allocation are presumptively unlawful under the antitrust laws, GEICO does not shoulder the burden of defining relevant markets or showing anticompetitive effects. *Per se* violations of the antitrust laws lack redeeming value and cannot be justified.

## VI.   GEICO Suffered Antitrust Injury

136.   The Defendants' price-fixing and market allocation conspiracies had the following effects, among others:

(a)   The prices of Auto Parts have been fixed, raised, maintained or stabilized at artificially inflated levels; and

(b)    Price competition has been restrained or eliminated with respect to Auto Parts.

137.   Auto Parts manufacturers charge supra-competitive prices for Auto Parts to repair professionals, OEMs and automotive dealers. Repair professionals then pass along the inflated prices to GEICO or its insureds or claimants. OEMs and automotive dealers also pass along inflated prices to GEICO's insureds and third-party claimants when the insureds or claimants purchase vehicles, thus inflating the value of the vehicle.

138.   GEICO purchased Auto Parts, reimbursed its insureds and claimants for Auto Parts from repair professionals, or otherwise made payment to its insureds and claimants for the value of Auto Parts during the Relevant Time Periods, and consequently paid artificially inflated prices that had been passed on from the repair professionals. GEICO also reimbursed its insureds and third-party claimants for the full vehicle value when a vehicle was declared a total loss.

139.   The individual Auto Parts Submarkets and the market for vehicles are inextricably linked and intertwined because the Auto Parts submarkets exist to serve the vehicle market. Without the vehicles, Auto Parts have little to no value because they have no independent utility. Auto Parts are a critical and necessary input to a finished vehicle, and vehicles similarly have little value without their component parts. Because Auto Parts are a necessary input to a finished vehicle, demand for vehicles drives demand for Auto Parts.

140.   Auto Parts are identifiable, discrete physical products and are separate from the vehicle in which they are installed. Auto Parts do not change form or become an indistinguishable part from the vehicle in which they are installed. As a result, Auto Parts may be traced through the chain of distribution. Because Auto Parts are discrete products, the cost and price of Auto Parts—and any price changes—also may be traced.

141.   Price changes in an Auto Part impact the overall price and value of the vehicle. Increases in the price of component Auto Parts lead to corresponding price increases in the price of new motor vehicles at the OEM and automotive dealer level. OEMs and dealers have thin margins, and these downstream distribution markets in which vehicles are sold are consequently highly competitive. OEMs and dealers pass on any overcharges they incur from automotive part suppliers to consumers, including GEICO's insureds and claimants. As a result, GEICO paid

artificially inflated prices for Auto Parts when it reimburses its insureds or claimants for a vehicle's value.

142.   The purpose of Defendants and their co-conspirators anticompetitive conduct was to raise, fix, maintain or stabilize the price of Auto Parts purchased for repair purposes.

143.   GEICO was overcharged for its purchase and reimbursement of replacement Auto Parts and the value of vehicles declared a total loss. Those overcharges have unjustly enriched Defendants.

144.   The precise amount of the overcharges impacting the prices of new vehicles containing Auto Parts and of replacement parts can be measured and quantified. Commonly used and well-accepted economic models may be used to measure both the extent and the amount of the supra-competitive prices passed through the distribution chain to GEICO. Thus, the economic harm to GEICO can be quantified. By reason of the alleged violations of the antitrust laws, GEICO has sustained injury to its businesses or property, having paid higher prices for Auto Parts than it would have paid in the absence of the Defendants' illegal agreements, combinations or conspiracies, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   GEICO' Claims Are Not Barred by the Statutes of Limitations

### A.   *The Statutes of Limitations Did Not Begin to Run Because GEICO Did Not and Could Not Discover Its Claims*

145.   GEICO repeats and re-alleges the allegations set forth above.

146.   GEICO had no knowledge of the combinations or conspiracies alleged herein, or of facts sufficient to place it on inquiry notice of the claims set forth herein, until the public announcements of the government investigations into price fixing and bid rigging of Auto Parts began.

147.   As an insurer who purchases replacement parts directly from repair professionals and reimburses its insureds and claimants for their purchase of replacement parts, GEICO has no direct contact or interaction with the Defendants and had no means from which it could have discovered the combinations and conspiracies described in this Complaint before the public announcements of the specific Auto Part government investigations.

148.   No information in the public domain was available to GEICO prior to the public announcements of the government investigations that revealed sufficient information to suggest that the Defendants were involved in criminal conspiracies to fix the price of Auto Parts, rig bids and allocate markets. GEICO had no means of obtaining (a) any facts or information concerning any aspect of the Defendants' dealings with repair professionals; (b) facts concerning Defendants and their co-conspirators' agreements and conspiracies alleged herein and (c) facts evidencing

the scope of DOJ and other governments' investigations and specific Auto Parts implicated.

149. For these reasons, the statutes of limitations as to GEICO's claims did not begin to run, at the earliest, until DOJ publicly announced the investigation into each Auto Part. Additionally, there may be other reasons why the statute of limitations periods did not commence running or were tolled as to GEICO.

### B. Defendants Committed Continuing Antitrust Violations, Which Re-Started the Applicable Statutes of Limitations

150. GEICO purchased or reimbursed its insureds and claimants for replacement Auto Parts hundreds of thousands, if not millions, of times during the Relevant Time Periods. The Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to a repair professional who then sold and/or installed the part in a GEICO insured or claimant's vehicle. Each Auto Part sale from a Defendant to a repair professional—followed by a sale to one of GEICO's insureds or claimants—resulted in an overcharge and injury to GEICO.

151. GEICO also reimbursed insureds and claimants for the full value of vehicles in the event of a total loss during the Relevant Time Periods. The Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to an OEM who then installed the part in a vehicle sold to a GEICO insured or claimant. Each Auto Part sale from a Defendant to an OEM—

followed by a sale to one of GEICO's insureds or claimants—resulted in an overcharge and injury to GEICO.

152.  For each overcharge and injury to GEICO, a cause of action accrued, restarting the relevant statute of limitations. Thus, Defendants committed their last overt acts in furtherance of the various conspiracies beginning in February 2010, and the relevant statutes for each Auto Part alleged thus begin from the date of the last overt acts.

153.  The continuing violation doctrine frequently arises in conspiracy cases because each price increase requires further collusion among the Defendants. Defendants were engaged in ongoing conspiracies, and each price increase resulted from additional collusion between and among the Defendants.

## C.  *Fraudulent Concealment Tolled the Statutes of Limitations*

154.  The doctrine of fraudulent concealment also tolled the relevant statutes of limitations. Defendants took active steps to conceal their wrongdoing, and GEICO did not discover, and could not have discovered, through the exercise of reasonable diligence the existence of Defendants' conspiracies until DOJ and the FBI publicly announced the investigations into each specific Auto Part. DOJ and the FBI continue to announce investigations and plea deals for automotive parts.

155.   Before the government's public announcements, GEICO was unaware of Defendants' unlawful conduct, and did not realize it was paying supra-competitive prices for Auto Parts throughout the United States during the Relevant Time Periods. No information, actual or constructive, was ever made available to GEICO that revealed the Defendants' price-fixing, bid rigging and market allocation conspiracies.

156.   Defendants' anticompetitive conspiracies and unlawful combinations were inherently self-concealing. Defendants and their co-conspirators met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs, repair professionals and other direct and indirect purchasers. Defendants also engaged in other surreptitious activity, including the use of code names and meeting at private residences or remote locations. The conspirators coordinated their pricing in a manner to avoid detection by the OEMs or repair professionals.

157.   Because the alleged conspiracies were both self-concealing and affirmatively concealed by Defendants and their co-conspirators, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Auto Parts prices before the public announcements of the government investigations began. GEICO specifically had no knowledge of the alleged conspiracies, or of any facts or information that would have caused a

reasonably diligent person to investigate whether a conspiracy existed, until the public announcements of the government investigation into each Auto Part began.

158.   For these reasons, the statutes of limitations applicable to GEICO' claims were tolled and did not begin to run until the DOJ publically announced its investigation into each Auto Part challenged herein.

> ### D.   *GEICO's Claims Were Tolled by the Class Complaints in the Auto Parts MDL*

159.   GEICO's claims were also tolled during the pendency of the class action suits in *In re Automotive Parts Antitrust Litigation*, MDL No. 2311, under the U.S. Supreme Court's decisions in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983). GEICO was a putative member of the proposed classes for the following relevant proposed (and Settlement) Auto Parts Classes: Air Flow Meters, Alternators, ATF Warmers, Automotive Wire Harness Systems, Electronic Throttle Bodies, Fuel Injection Systems, High Intensity Discharge Ballasts, Ignition Coils, Inverters, Motor Generators, Occupant Safety Restraint Systems, Radiators, Starters, Steering Angle Sensors, Switches and Valve Timing Control Devices. The Auto Parts class cases were consolidated into the *In re Automotive Parts Antitrust Litigation*, MDL No. 2311. GEICO's claims were thus tolled from the filing of the class suits until GEICO opted out of the litigation on April 11, 2016.

## VIII.  GEICO Paid Supra-Competitive Prices for Auto Parts

160.   During the Relevant Time Periods, GEICO purchased or reimbursed its insureds and claimants for Auto Parts from repair professionals in amounts exceeding $789 million, including:

(a)    During the Air Conditioning Systems Relevant Time Period, GEICO paid approximately $384 million in supra-competitive prices for Air Conditioning Systems.

(b)    During the Air Flow Meters Relevant Time Period, GEICO paid approximately $1.7 million in supra-competitive prices for Air Flow Meters.

(c)    During the Air Fuel Ratio Sensors Relevant Time Period, GEICO paid supra-competitive prices for Air Fuel Ratio Sensors in amounts to be determined at trial.

(d)    During the Alternators Relevant Time Period, GEICO paid approximately $7 million in supra-competitive prices for Alternators.

(e)    During the Anti-Vibrational Rubber Parts Relevant Time Period, GEICO paid approximately $24 million in supra-competitive prices for Anti-Vibrational Rubber Parts.

(f)    During the ATF Warmers Relevant Time Period, GEICO paid approximately $45 million in supra-competitive prices for ATF Warmers.

(g)     During the Automotive Hoses Relevant Time Period, GEICO paid approximately $25 million in supra-competitive prices for Automotive Hoses.

(h)     During the Automotive Wire Harness Systems Relevant Time Period, GEICO paid approximately $14.7 million in supra-competitive prices for Automotive Wire Harness Systems.

(i)     During the Bearings Relevant Time Period, GEICO paid approximately $65 million in supra-competitive prices for Bearings.

(j)     During the Ceramic Substrates Relevant Time Period, GEICO paid supra-competitive prices for Ceramic Substrates in amounts to be determined at trial.

(k)     During the Electronic Powered Steering Assemblies Relevant Time Period, GEICO paid supra-competitive prices for Electronic Powered Steering Assemblies in amounts to be determined at trial.

(l)     During the Fan Motors Relevant Time Period, GEICO paid approximately $18 million in supra-competitive prices for Fan Motors.

(m)     During the Fuel Injection Systems Relevant Time Period, GEICO paid approximately $11 million in supra-competitive prices for Fuel Injection Systems.

(n)     During the Fuel Senders Relevant Time Period, GEICO paid approximately $348,000 in supra-competitive prices for Fuel Senders.

(o)     During the Heater Control Panels Relevant Time Period, GEICO paid approximately $3.2 million in supra-competitive prices for Heater Control Panels.

(p)     During the HID Ballasts Relevant Time Period, GEICO paid approximately $1.9 million in supra-competitive prices for High Intensity Discharge Ballasts.

(q)     During the Ignition Coils Relevant Time Period, GEICO paid approximately $850,000 in supra-competitive prices for Ignition Coils.

(r)     During the Instrument Panel Clusters Relevant Time Period, GEICO paid approximately $6 million in supra-competitive prices for Instrument Panel Clusters.

(s)     During the Inverters Relevant Time Period, GEICO paid approximately $4 million in supra-competitive prices for Inverters.

(t)     During the Motor Generators Relevant Time Period, GEICO paid supra-competitive prices for Motor Generators in amounts to be determined at trial.

(u)     During the Power Window Motors Relevant Time Period, GEICO paid approximately $1.7 million in supra-competitive prices for Power Window Motors.

(v)     During the Power Window Switches Relevant Time Period, GEICO paid approximately $1.5 million in supra-competitive prices for Power Window Switches.

(w)     During the Radiators Relevant Time Period, GEICO paid approximately $278 million in supra-competitive prices for Radiators.

(x)     During the Spark Plugs Relevant Time Period, GEICO paid approximately $492,000 in supra-competitive prices for Spark Plugs.

(y)     During the Standard Oxygen Sensors Relevant Time Period, GEICO paid supra-competitive prices for Standard Oxygen Sensors in amounts to be determined at trial.

(z)     During the Starters Relevant Time Period, GEICO paid approximately $2.8 million in supra-competitive prices for Starters.

(aa)    During the Valve Timing Control Devices Relevant Time Period, GEICO paid approximately $2 million in supra-competitive prices for Valve Timing Control Devices.

(bb)   During the Windshield Washer Systems Relevant Time Period, GEICO paid approximately $57 million in supra-competitive prices for Windshield Washer Systems.

(cc)   During the Windshield Wiper Systems Relevant Time Period, GEICO paid approximately $9.5 million in supra-competitive prices for Windshield Wiper Systems.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act

161.   GEICO incorporates by reference the allegations in the preceding paragraphs.

162.   Defendants and unnamed conspirators entered into and engaged in contracts, combinations or conspiracies that unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

163.   The acts committed by each of the Defendants as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

164.   During the Relevant Time Periods, Defendants and their co-conspirators entered into continuing agreements, understandings and conspiracies in restraint of trade to artificially fix, raise, stabilize and control prices for Auto Parts. Agreements to fix prices, rig bids and allocate markets are *per se* violations

of the Sherman Act and presumptively anticompetitive. The conspiratorial acts and combinations have unreasonably restrained competition in the Auto Parts Submarkets.

165. The anticompetitive acts were intentionally directed at the United States Auto Parts Submarkets and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of Auto Parts throughout the United States.

166. As a result of Defendants' unlawful conduct, GEICO has been injured in its business or property because it paid—either directly or through reimbursement to its insureds or claimants—inflated, supra-competitive prices for Auto Parts and vehicles declared a total loss. GEICO paid more than it would have paid for Auto Parts and vehicles in the absence of the conspiracies. GEICO's injuries flow directly from Defendants' anticompetitive price-fixing, bid rigging and market allocation conspiracies, as Defendants conspired to fix prices for Auto Parts and then charged repair professionals, OEMs and automotive dealers supra-competitive, fixed prices for the replacement and new parts. The repair professionals, OEMs and automotive dealers passed on these inflated, supra-competitive prices to GEICO and their insureds and claimants. GEICO's injuries are the type that the antitrust laws were intended to prevent.

167.   Defendants and their co-conspirators' conspiracies had the following effects on the relevant Auto Parts Submarkets:

(a)   Prices for Auto Parts sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States;

(b)   Price competition has been restrained, suppressed and/or eliminated in the United States;

(c)   Defendants' conspiracies also have decreased innovation and quality in the Auto Parts Submarkets; and

(d)   GEICO, repair professionals, OEMs, automotive dealers and consumers (including GEICO's insureds or claimants) have been deprived of the benefits of free and open competition in the Auto Parts Submarkets and have paid supra-competitive prices;

168.   GEICO is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes

169.   GEICO incorporates and realleges, as though fully set forth herein, the allegations in Paragraphs 1-195 of this Second Amended Complaint.

170.   During the Relevant Time Periods, Defendants and their co-conspirators engaged in continuing contracts, combinations or conspiracies with

respect to the price of Auto Parts. Defendants and their co-conspirators' agreements and conspiracies unreasonably restrained trade and commerce in violation of various state antitrust and other statutes described below.

171. Defendants and their co-conspirators agreed to fix, raise, inflate, stabilize and/or maintain artificially supra-competitive prices for Auto Parts, to rig bids and to allocate markets for Auto Parts in the United States.

172. In formulating and effectuating these conspiracies, Defendants and their co-conspirators performed acts in furtherance of these agreements and conspiracies, including:

(a)　participating in secret meetings and conversations among themselves in the United States and elsewhere during which they agreed (i) to price Auto Parts at certain levels, and otherwise to fix, increase, inflate, maintain or stabilize effective prices paid by repair professionals, OEMs and automotive dealers—and subsequently GEICO—with respect to Auto Parts sold in the United States; (ii) to rig bids for Auto Parts and (iii) to allocate customers and markets for Auto Parts in the United States in furtherance of their conspiracies; and

(b)　participating in secret meetings and conversations among themselves in the United States and elsewhere to implement, adhere to and police the unlawful price-fixing, bid rigging and market allocation conspiracies.

173.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase or stabilize prices, to rig bids and to allocate markets with respect to Auto Parts.

174.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

175.   Defendants and their co-conspirators have knowingly agreed and entered combinations to fix Auto Parts prices and unlawfully restrain trade in violation of Alabama Code §§ 8-10-1, et seq.

(a)     Defendants' agreements, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Alabama; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Alabama; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected Alabama commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' agreements and combinations unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Alabama Code §§ 8-10-1, et seq. Accordingly, GEICO seeks all forms of relief available under Alabama Code §§ 8-10-1, et seq. and § 6-5-60.

176.   Defendants and their co-conspirators entered contracts, combinations and/or conspiracies to restrain trade in violation of the Arizona Revised Statutes §§ 44-1401, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Arizona; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Arizona; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' agreements and combinations unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401, et seq. Accordingly, GEICO seeks all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, et seq.

177. Defendants and their co-conspirators have entered into trusts to restrict trade and fix prices in violation of the California Business and Professions Code §§ 16700, et seq.

(a)     Defendants and their co-conspirators combined their capital and skill, as well as acted, for the purpose of restricting trade or commerce in California and fixing prices. Defendants and their co-conspirators also entered into and carried out their contracts and agreements with the purpose of establishing and keeping the price of Auto Parts at a fixed level in an effort to preclude free competition in the sale of Auto Parts.

(b)     Defendants' contracts (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout California; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout California; (iii) deprived GEICO and its insureds and claimants of free and

open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(c)   During the Relevant Time Periods, Defendants' illegal conduct substantially affected California commerce.

(d)   As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)   Defendants' contracts unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of California Business and Professions Code, § 16720. Accordingly, GEICO seeks all forms of relief available under California Business and Professions Code §§ 16750.

178. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade within the District of Columbia in violation of the District of Columbia Code §§ 28-4501, et seq.

(a)   Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout the District of Columbia; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout the District of Columbia; (iii) deprived GEICO and its insureds and claimants of free and

open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

 (d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of the District of Columbia Code, §§ 28-4501, et seq. Accordingly, GEICO seeks all forms of relief available under District of Columbia Code, §§ 28-4501, et seq.

179.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade within Hawaii in violation of the Hawaii Revised Statutes §§ 480-1, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Hawaii; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Hawaii; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts

Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Hawaii.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Hawaii Revised Statutes §§ 480-1, et seq. Accordingly, GEICO seeks all forms of relief available under Hawaii Revised Statutes §§ 480-1, et seq.

180.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to unreasonably restrain trade in violation of Illinois Compiled Statutes 740 §§ 10/1, et seq.

(a)     Defendants entered contracts and engaged in combinations and conspiracies with its competitors for the purpose of fixing prices, rigging bids and allocating markets, which are unreasonable restraints of trade.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels

throughout Illinois; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Illinois; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Illinois.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Illinois Compiled Statutes 740 §§ 10/1, et seq. Accordingly, GEICO seeks all forms of relief available under Illinois Compiled Statutes 740 §§ 10/1, et seq.

181. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of the Iowa Code §§ 553.1, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels

throughout Iowa; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Iowa; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Iowa.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Iowa Code, §§ 553.1, et seq. Accordingly, GEICO seeks all forms of relief available under Iowa Code §§ 553.1, et seq.

182.   Defendants and their co-conspirators entered a trust to restrain trade in violation of the Kansas Statutes §§ 50-101, et seq.

(a)     Defendants combined their capital, skill and acts for the purpose of restricting trade, increasing the price of Auto Parts, and preventing competition in the sale of Auto Parts. Defendants also made and entered into

contracts and agreements to fix and keep the price of Auto Parts at a fixed level, thereby precluding free and unrestricted competition.

(b)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Kansas; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Kansas; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Kansas.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Kansas Statutes §§ 50-101, et seq. Accordingly, GEICO seeks all forms of relief available under Kansas Statutes §§ 50-101, et seq.

183. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in Maine in violation of Maine Revised Statutes §§ 1101, et seq.

(a)   Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Maine; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Maine; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)   During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Maine.

(c)   As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)   Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Maine Revised Statutes §§ 1101, et seq. Accordingly, GEICO seeks all forms of relief available under Maine Revised Statutes §§ 1101, et seq.

184. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Michigan Compiled Laws §§ 445.771, et seq.

(a) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Michigan; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Michigan; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Michigan.

(c) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d) Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Michigan Compiled Laws §§ 445.771, et seq. Accordingly,

GEICO seeks all forms of relief available under Michigan Compiled Laws §§ 445.771, et seq. and 445.778.

185. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Minnesota Statutes §§ 325D.49, et seq.

(a)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Minnesota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Minnesota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Minnesota.

(c)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

 (d)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Minnesota Statutes §§ 325D.49, et seq. Accordingly, GEICO

seeks all forms of relief available under Minnesota Statutes §§ 325D.49, et seq.

186. Defendants and their co-conspirators agreed and entered into combinations and contracts to restrain trade in violation of Mississippi Code §§ 75-21-1, et seq.

(a) Defendants' agreements, combinations and/or contracts had the effect of (i) fixing, raising, maintaining and stabilizing Auto Parts prices at artificially high levels throughout Mississippi; (ii) restraining, suppressing and eliminating price competition for Auto Parts throughout Mississippi; (iii) depriving GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulting in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Mississippi.

(c) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d) Defendants' contracts, combinations and agreements unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in

violation of Mississippi Code §§ 75-21-1, et seq. Accordingly, GEICO seeks all forms of relief available under Mississippi Code §§ 75-21-1, et seq.

187. Defendants and their co-conspirators agreed and entered into combinations and contracts to restrain trade in violation of Nebraska Statutes §§ 59-801, et seq.

(a) Defendants' contracts and combinations (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Nebraska; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Nebraska; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Nebraska.

(c) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d) Defendants' contracts and combinations unlawfully fixed Auto Parts prices, allocated markets and restrained trade in violation of Nebraska

Statutes §§ 59-801, et seq. Accordingly, GEICO seeks all forms of relief available under Nebraska Statutes §§ 59-801, et seq.

188.    Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Nevada Revised Statutes §§ 598A.010, et seq.

(a)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Nevada; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Nevada; (iii) rigged bids; (iv) allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Nevada.

(c)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Nevada Revised Statutes §§ 598A.010, et seq. Accordingly,

GEICO seeks all forms of relief available under Nevada Revised Statutes §§ 598A.010, et seq.

189.   Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq.

(a)   Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New Hampshire; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout New Hampshire; (iii) rigged bids; (iv) allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)   During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New Hampshire.

(c)   As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)   Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq. Accordingly,

GEICO seeks all forms of relief available under New Hampshire Revised Statutes §§ 356:1, et seq.

190. Defendants and their co-conspirators entered into contracts, agreements, combinations and/or conspiracies to restrain trade in New Mexico in violation of New Mexico Statutes §§ 57-1-1, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New Mexico; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout New Mexico; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New Mexico.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New Mexico Statutes §§ 57-1-1, et seq. Accordingly, GEICO

seeks all forms of relief available under New Mexico Statutes §§ 57-1-1, et seq.

191. Defendants and their co-conspirators entered into contracts, agreements and/or combinations to restrain trade and competition in violation of New York Gen. Bus. Code §§ 340, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New York; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout New York; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New York.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New York Gen. Bus. Code §§ 340, et seq. Accordingly, GEICO

seeks all forms of relief available under New York Gen. Bus. Code §§ 340, et seq.

192. Defendants and their co-conspirators entered into contracts, combinations and/or conspiracies to restrain trade in North Carolina in violation of North Carolina General Statutes §§ 75-1, et seq.

(a)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout North Carolina; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout North Carolina; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in North Carolina.

(c)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of North Carolina General Statutes §§ 75-1, et seq. Accordingly,

GEICO seeks all forms of relief available under North Carolina General Statutes §§ 75-1, et seq.

193. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of North Dakota Century Code §§ 51-08.1-01, et seq.

(a) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout North Dakota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout North Dakota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in North Dakota.

(c) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d) Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, et seq. Accordingly,

GEICO seeks all forms of relief available under North Dakota Century Code §§ 51-08.1-01, et seq.

194. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Oregon Revised Statutes §§ 646.705, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Oregon; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Oregon; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Oregon.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Oregon Revised Statutes §§ 646.705, et seq. Accordingly,

GEICO seeks all forms of relief available under Oregon Revised Statutes §§ 646.705, et seq.

195. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in South Dakota in violation of South Dakota Codified Laws §§ 37-1-3.1, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout South Dakota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout South Dakota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in South Dakota.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, et seq. Accordingly,

GEICO seeks all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, et seq.

196. Defendants and their co-conspirators entered into contracts, agreements, trusts and/or combinations to restrain competition in violation of Tennessee Code §§ 47-25-101, et seq.

(a)     Defendants' contracts, combinations, agreements and/or trusts (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Tennessee; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Tennessee; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Tennessee.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Tennessee Code §§ 47-25-101, et seq. Accordingly, GEICO

seeks all forms of relief available under Tennessee Code §§ 47-25-101, et seq.

197. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Utah Code §§ 76-10-3101, et seq.

(a) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Utah; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Utah; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Utah.

(c) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d) Defendants contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in

violation of Utah Code §§ 76-10-3101, et seq. Accordingly, GEICO seeks all forms of relief available under Utah Code §§ 76-10-3101, et seq.

198. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Vermont Statutes 9 §§ 2453, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Vermont; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Vermont; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and (v) constituted an unfair method of competition.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Vermont.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in

violation of Vermont Statutes 9 §§ 2453, et seq. Accordingly, GEICO seeks all forms of relief available under Vermont Statutes 9 §§ 2453, et seq.

199. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of West Virginia Code §§ 47-18-1, et seq.

(a)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout West Virginia; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout West Virginia; (iii) rigged bids; (iv) allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in West Virginia.

(c)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)     Defendants contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of West Virginia Code §§ 47-18-1, et seq. Accordingly, GEICO

seeks all forms of relief available under West Virginia Code §§ 47-18-1, et seq.

200. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Wisconsin Statutes §§ 133.01, et seq.

(a)   Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Wisconsin; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Wisconsin; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts.

(b)   During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Wisconsin.

(c)   As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(d)   Defendants contracts, combinations and conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Wisconsin Statutes §§ 133.01, et seq. Accordingly, GEICO

seeks all forms of relief available under Wisconsin Statutes §§ 133.01, et seq.

201.  GEICO in each of the above states has been injured in its business and property by reason of Defendants' unlawful combinations, contracts, conspiracies and agreements. GEICO has paid more for Auto Parts than it otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

202.  In addition, Defendants have profited significantly from the described conspiracies. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of GEICO and its insureds and claimants.

203.  Accordingly, GEICO seeks damages (including statutory damages where applicable) in each of the above jurisdictions, to be trebled or otherwise increased as permitted by a particular jurisdiction's law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes

204.  GEICO incorporates and realleges, as though fully set forth herein, the allegations in Paragraphs 1-230 of this Second Amended Complaint.

205.   Defendants engaged in unfair competition and unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

206.   Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Arkansas Code, § 4-88-101, et seq.

(a)   The Defendants knowingly agreed to, and did in fact, restrain trade or commerce by fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Auto Parts were sold, distributed or obtained in Arkansas and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)   Defendants' unlawful conduct constitutes deceptive and unconscionable trade practices in violation of Arkansas Code, § 4-88-107(a)(10).

(c)   Defendants' unlawful conduct had the following effects: (i) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas; (ii) Auto Parts price competition was restrained, suppressed and eliminated throughout Arkansas; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)   During the Relevant Time Periods, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)   As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured in its business and property and is threatened with further injury.

(f)   Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Arkansas Code, § 4-88-107(a)(10) and, accordingly, GEICO seeks all relief available under that statute.

207.   Defendants have engaged in unfair competition and unlawful, unfair and/or deceptive acts or practices in violation of California Business and Professions Code §§ 17200, et seq.

(a)   During the Relevant Time Periods, Defendants marketed, sold and/or distributed Auto Parts in California.

(b) Defendants' unlawful conduct constitutes "unfair competition" in violation of California Business and Professions Code § 17200.

(c)   Defendants' unlawful conduct had the following effects: (i) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout California; (ii) Auto Parts price competition was restrained, suppressed and eliminated throughout California; (iii) GEICO

was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)     The effects of Defendants' illegal conduct continue, and there is no indication that Defendants will cease such activity into the future.

(e)     Defendants' unlawful and unfair business practices, as described above, have caused and continue to cause GEICO to pay supra-competitive and artificially-inflated prices for Auto Parts. GEICO suffered injury-in-fact and lost money or property as a result of such unfair competition.

(f)     GEICO is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.

 (g)     As alleged in this Amended Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. GEICO is accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

208.   Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.

(a)   The Defendants knowingly agreed to, and did in fact, restrain competition by fixing, controlling and/or maintaining at non-competitive and artificially inflated levels the prices at which Auto Parts were sold, distributed or obtained in Florida and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)   Defendants' unlawful conduct constitutes unfair competition as well as unconscionable, unfair and deceptive trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act.

(c)   Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout Florida; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)   During the Relevant Time Periods, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured and is threatened with further injury.

(f)     Defendants have engaged in unfair competition and unconscionable, unfair and deceptive acts or practices in violation of Florida Stat. §§ 501.201, et seq., and, accordingly, GEICO seeks all relief available under that statute.

209.   Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of Nevada Revised Statutes §§ 598.0903, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in Nevada by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in Nevada and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes deceptive trade practices in violation of Nevada Revised Statutes §§ 598.0923(3) because Defendants knowingly violated  §§ 598A.010, et seq.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout Nevada; (ii) Auto Parts prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Nevada; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices in violation of Nevada Revised Statutes §§ 598.0903, et seq., and, accordingly, GEICO seeks all relief available under that statute.

210.   Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of New Hampshire Revised Statutes §§ 358-A:1, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in New Hampshire by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in New Hampshire and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes unfair methods of competition and unfair and deceptive trade practices in violation of New

Hampshire Revised Statutes §§ 358-A:2(XIV) because Defendants priced Auto Parts in a manner that harmed competition.

(c)    Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout New Hampshire; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of New Hampshire Revised Statutes §§ 358-A:1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

211. Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of New Mexico Stat. §§ 57-12-1, et seq.

(a)    Defendants agreed to, and did in fact, restrain trade or commerce by affecting, fixing, controlling and/or maintaining at noncompetitive and artificially inflated levels the prices at which Auto Parts were sold,

112

distributed or obtained in New Mexico and took efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes "unconscionable trade practices" in violation of New Mexico Stat. §§ 57-12-3 and 57-12-2, in that (i) Defendants took advantage of GEICO's lack of knowledge of what the price of Auto Parts should be in a competitive market and (ii) such conduct resulted in a gross disparity between the value received by GEICO and the prices GEICO paid for Auto Parts as set forth in N.M.S.A., § 57-12-2(E). GEICO was not aware of Defendants' price-fixing, bid rigging and market allocation conspiracies and was therefore unaware that it was being unfairly and illegally overcharged. As indirect purchasers, GEICO paid repair professionals, or reimbursed its insureds and claimants, for Auto Parts. GEICO did not, and could not, directly negotiate Auto Parts prices with the Defendants. The suppression of competition that has resulted from Defendants' conspiracies has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Auto Parts not only for GEICO, but also for consumers.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated

throughout New Mexico; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra- competitive, artificially inflated prices for Auto Parts.

(d)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured and is threatened with further injury.

(f)     Defendants have engaged in unconscionable trade practices in violation of New Mexico Stat. §§ 57-12-1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

212. Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts and/or practices in violation of N.Y. Gen. Bus. Law § 349, et seq.

(a)     Defendants agreed to, and did in fact, restrain trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Auto Parts were sold, distributed or obtained in New York and took efforts to conceal their agreements from GEICO and other purchasers.

(b)   Defendants' unlawful conduct constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349. Defendants' deceptive practices injured consumers and adversely impacted the public at large.

(c)   Defendants and their co-conspirators' public statements about the prices of Auto Parts omitted material information, and Defendants therefore affirmatively misrepresented the true cause of price increases for Auto Parts. Defendants alone possessed material information that was relevant to GEICO and other purchasers, but failed to provide the information. A reasonable consumer would have been misled by Defendants' statements as to the prices of Auto Parts.

(d)   Defendants knew that their unlawful trade practices with respect to pricing Auto Parts would have an impact on consumers and indirect purchasers of Auto Parts and not just the Defendants' direct customers.

(e)   Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout New York; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (iii) GEICO and New York consumers were deprived of free and open competition and

(iv) GEICO and New York consumers paid supra-competitive, artificially inflated prices for Auto Parts.

(f)     During the Relevant Time Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Auto Parts in New York.

(g)     During the Relevant Time Periods, Defendants marketed, sold and/or distributed Auto Parts in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

(h)     As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured and is threatened with further injury.

(i)     GEICO seeks all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

213.   Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of North Carolina Gen. Stat. § 75-1.1, et seq.

(a)     Defendants agreed to, and did in fact, restrain trade and commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels the prices at which Auto Parts were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from GEICO and other purchasers.

116

(b)     Defendants' unlawful conduct constitutes unfair methods of competition and unfair and deceptive trade practices affecting commerce in violation of North Carolina Gen. Stat. § 75-1.1.

(c)     Defendants' price-fixing, bid rigging and market allocation conspiracies could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing, bid rigging and market allocation conspiracies. Defendants' public statements concerning the price of Auto Parts created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracies. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracies to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents that would reveal the antitrust violations.

(d)     Defendants' conduct injured consumers and adversely impacted the North Carolina public at large.

(e)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated

117

throughout North Carolina; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(f)     During the Relevant Time Periods, Defendants marketed, sold or distributed Auto Parts in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(g)     During the Relevant Time Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Auto Parts in North Carolina.

(h)     Defendants have engaged in unfair methods of competition and unfair and deceptive trade practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

214.  Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of South Carolina Code of Laws §§ 39-5-10, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in South Carolina by affecting, fixing, controlling and/or

maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in South Carolina and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)    Defendants' unlawful conduct constituted unfair methods of competition and unfair and deceptive trade practices in violation of South Carolina Code of Laws § 39-5-10.

(c)    Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout South Carolina; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)    By reason of the foregoing, Defendants knowingly and willfully engaged in unfair competition and unfair and deceptive acts or practices, in violation of South Carolina Code of Laws §§ 39-5-10, et seq., and, accordingly, GEICO seeks all relief available under that statute.

215.  Defendants have knowingly entered into unlawful agreement in restraint of trade and commerce in violation of 9 Vermont § 2451, et seq.

(a)     Defendants agreed to, and did in fact, restrain trade or commerce in a market that includes Vermont, by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Auto Parts were sold, distributed, or obtained in Vermont.

(b)     Defendants' unlawful conduct constituted unfair methods of competition and unfair and deceptive trade practices in violation of 9 Vermont § 2453.

(c)     Defendants deliberately failed to disclose material facts to GEICO, purchasers and consumers concerning Defendants' unlawful activities and artificially inflated prices for Auto Parts. Defendants owed a duty to disclose such facts and breached that duty. Defendants misrepresented to all consumers during the Relevant Time Periods that Defendants' Auto Parts prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed, and eliminated throughout Vermont; (ii) Auto Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (iii) GEICO was deprived of free and open competition and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts.

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(f)     Defendants' misleading conduct constitutes unfair competition and unfair and deceptive acts or practices in violation of 9 Vermont § 2451, et seq., and, accordingly, GEICO seeks all relief available under that statute.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

216.   GEICO incorporates by reference the allegations Paragraphs 1-242 of this Second Amended Complaint.

217.   GEICO brings claims for unjust enrichment in the following states: Alabama, Arizona, Arkansas, Colorado, DC, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

218.   GEICO paid inflated prices for Auto Parts and vehicles because of Defendants' unlawful price-fixing, bid rigging and market allocation conspiracies. By paying these inflated prices for Auto Parts, GEICO paid more for Auto Parts and vehicles declared a total loss than it would have in the absence of the anticompetitive conspiratorial conduct. The differential between the inflated prices

and the prices in a competitive market for Auto Parts and vehicles was a benefit that GEICO conferred on Defendants.

219.   Defendants knew that GEICO and other purchasers were overcharged for Auto Parts and vehicles and that GEICO thus conferred a benefit on them. Defendants intentionally entered the conspiracies to induce the overpayment by GEICO and other purchasers.

220.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Auto Parts.

221.   Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by GEICO for Auto Parts.

222.   GEICO is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.

223.   Pursuit of any remedies against the repair professionals from which GEICO purchased Auto Parts subject to Defendants' conspiracies would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

224.  Accordingly, GEICO respectfully requests that:

A.  The Court determine that the unlawful agreements, conspiracies and combinations alleged herein be adjudged and decreed:

(i)  Unreasonable restraints of trade or commerce in violation of Section 1 of the Sherman Act;

(ii)  *Per se* violations of Section 1 of the Sherman Act;

(iii)  Unlawful combinations, trusts, agreements, understandings and/or concerts of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(iv)  Acts of unjust enrichment by Defendants as set forth herein.

B.  GEICO recovers damages, to the maximum extent allowed under each jurisdiction, and that a joint and several judgment in favor of GEICO be entered against Defendants in an amount to be trebled to the extent each jurisdiction permits;

C.  Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, agreements, conspiracies or combinations alleged herein,

or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     GEICO be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

E.     GEICO be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.     GEICO recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

G.     GEICO recovers such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims so triable in this matter.

Respectfully submitted,
MYERS & MYERS, PLLC:

| March 21, 2017 | /s/ Rebecca J. S. Cassell |
|---|---|
| Date | Kelly A. Myers (P49143) |

kmyers@myers2law.com
Rebecca J. Cassell (P64456)
rcassell@myers2law.com
915 N. Michigan Avenue
Howell, MI 48843
(517) 540-1700
*As local counsel for Plaintiffs*

LEWIS ROCA ROTHGERBER CHRISTIE LLP:

| March 21, 2017 | /s/ Dan Goldfine |
|---|---|
| Date | Dan Goldfine (Adm ED MI, AZ Bar 018788) |

dgoldfine@lrrc.com
201 East Washington St.
Suite 1200
Phoenix, AZ 85004
602-262-5392

Frederick J. Baumann (Adm ED MI, CO Bar 12156)
fbaumann@lrrc.com
Diane R. Hazel (Adm ED MI, CO Bar 42954)
dhazel@lrrc.com
1200 17th Street
Suite 3000
Denver, CO 80202

*Attorneys for Plaintiffs*